| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 14391 CANYON ROAD, ANCHORAGE, AK 99516 | Case No. 3:19-MJ-00587-MMS<br><br>**Filed Under Seal** |



DEC - 5 2019

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Tyler Vose, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Special Agent with the FBI since May 2011. Since that time I have been assigned investigative responsibilities in the areas of public corruption in the Detroit and San Juan Field Offices, Indian country matters on the Pine Ridge Indian Reservation in South Dakota, and public corruption violations in the Anchorage Field Office, where I am currently assigned. The Anchorage Field Office is located within the District of Alaska. Prior to being an FBI Special Agent, I served as a Human Intelligence Collector with the United States Army for 5 years and 7 months. In addition to traditional combat duties, I conducted military source operations and interrogations on suspected members of Al-Qa'ida and other radical Islamic terrorist/insurgent groups in Iraq.

2.      I make this affidavit in support of an application for a search warrant for the residence of NATHAN MICHAEL KEAYS located at 14391 Canyon Road, Anchorage, AK, 99516 (hereinafter the "**TARGET RESIDENCE**") -- a two-story green and brown wood residence, with a brown colored garage door and is further described in Attachment A -- and to search and seize any items identified in Attachment B. Attachment A and Attachment B are

1

hereby incorporated fully by reference herein. I also respectfully request to be permitted to seize all electronic devices, as described in Attachment B that may be located on the premises and further access and search the contents of said electronic devices without seeking an additional or separate warrant. The purpose of this warrant is to search for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 – Wire Fraud, 18 U.S.C. § 1956 – Laundering of Monetary Instruments, 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, and 18 U.S.C. § 371 – Conspiracy to commit Wire Fraud and Money Laundering (hereinafter the "**SUBJECT OFFENSES**")

3. The information set forth below is based upon my knowledge of the investigation conducted by the FBI. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, various documents, database records, and other information. I have not included each and every fact obtained pursuant to this investigation, and instead have only included facts sufficient to establish probable cause for the requested search warrant to issue.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations the **SUBJECT OFFENSES** have been committed, are being committed, and will be committed by KEAYS, FORREST WRIGHT, and his wife AMANDA WRIGHT. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because the **TARGET RESIDENCE** is located in the District of Alaska. *See* Fed. R. Crim. P. 41(b)(1).



## DEFINITIONS AND TERMINOLOGY

6.      Due to the industry specific nature of the allegations contained in this affidavit, it is important to understand the terminology and provide definitions of relevant terms, both industry specific and general financial terms that may be used below.

    a.   100% Pad – An 8-10 acre materials staging area for exploration operations. This ConocoPhillips Company property is located in Deadhorse, Alaska.

    b.   Actian – Is a third party e-invoicing company contracted with ConocoPhillips Company to intake invoices and supporting documents electronically from ConocoPhillips Company vendors. Vendors sign up for an account with Actian, and have to login to Actian using the internet to be able to submit invoices and supporting documentation for payment.

    c.   Alaska Railroad Yard – A storage and materials transfer facility located in Fairbanks where oil companies stage equipment to be moved northward for drilling operations. The Alaska Railroad Corporation is a public corporation authorized to own and operate the Alaska Railroad.

    d.   Alpine – A North Slope drilling location on the Colville Delta. The only way to get there is over the ice-road or by airplane.

    e.   ASRC Energy Services (AES) – Is a subsidiary of Arctic Slope Regional Corporation, that provides contracting work to ConocoPhillips Company.

    f.   Bill of Lading (BOL) – A detailed list of materials shipped or delivered. This is in the form of a receipt. With respect to ConocoPhillips Company,

DEC - 5 2019

the acquisition of the Bill of Lading was the third step in the material acquisition process.

g. Casing – A hollow steel pipe used to line the inside of a drilled hole and provides protection for groundwater and aquifers during an oil drilling operation.

h. ConocoPhillips Company (COP) – Oil company headquartered in Houston, Texas, with financial matters handled in Bartlesville, Oklahoma.

i. ConocoPhillips Company-Alaska (COPA) – ConocoPhillips Company branch operating in Alaska.

j. Electronic Funds Transfer (EFT) – Synonymous with ePayments, EFT is a broad term that includes many types of electronic payments such as Automated Clearing House (ACH) transfers, wire transfers, direct deposits, eChecks, personal computer banking, among others. In short, an EFT is an electronic transfer of money from one bank account to another.

k. Extended Reach Drilling (ERD) – Directional drilling of long horizontal wells for the purpose of reaching a larger area from one surface drilling location, and to maximize its productivity while maintaining a small surface footprint.

l. Freight on Board (FOB) – A term often used when discussing the shipment of materials both domestically and internationally.

m. Goods Receipt – Generated in ConocoPhillips Company's SAP system once someone has physically verified that the ordered material has arrived

4

at its intended location. The goods receipt is the fourth step in the material acquisition process.

n. Health, Safety and Environment (HSE) – Refers to a branch of a company that is responsible for the observance and protection of occupational health and safety rules and environmental protection.

o. Invoice – With respect to ConocoPhillips Company the invoicing is the fifth and final step before payment occurs in the material acquisition process. Once the goods receipt is generated in the SAP system, the vendor becomes authorized to submit an invoice to ConocoPhillips Company for payment. The invoice is a detailed list of goods sent or services provided, with a total sum due.

p. Joint – A single piece of straight pipe.

q. Kuparuk – Located on the North Slope near Prudhoe Bay, Kuparuk is North America's second largest oil field.

r. Oil Country Tubular Goods (OCTG) – Is a family of seamless rolled products consisting of drill pipe, casing and tubing.

s. Purchase Order (PO) – With respect to ConocoPhillips Company, the purchase order is the second step in the material acquisition process. It acts as a contract to order the material, and also includes a delivery point, a cost object, expected delivery time, instructions on how to invoice, and payment terms.

t. Requisition – With respect to ConocoPhillips Company, a requisition is an order. It is the first step in the material acquisition process. The

DEC – 5 2019

5

requisition explains what is needed, the quantity, price, and the vendor designated to provide the materials. ConocoPhillips Company has allowed some requisitioners to act as approvers of the requisition up to specific dollar amounts, for efficiency. The approval amount varies between employees.



DEC – 5 2019

u. SAP System – ConocoPhillips Company's internal time management and financial records recording system.

v. Tubing – A length of pipe assembled to provide a conduit through which oil and/or gas will be produced from a wellbore.

## GENERAL SCHEME

7. FORREST and his wife AMANDA are at the center of a large and active fraud scheme involving ConocoPhillips Company-Alaska (hereinafter "COPA"), and two COPA vendors: DB Oilfield Support Services (hereinafter "DB Oilfield") and Eco Edge Armoring, LLC (hereinafter "Eco Edge"). DAVID BENEFIELD is the owner of DB Oilfield. BENEFIELD is AMANDA's father, and FORREST's father-in-law. The owner of Eco Edge is NATHAN KEAYS, an active duty Anchorage K-9 Police Officer. Open source record searches revealed that it is highly likely that FORREST and KEAYS graduated from West Valley High School in Fairbanks, Alaska in 1998. Additionally, AMANDA and KEAYS's wife, Kelly Keays seemed to have attended North Pole High School together. FORREST is a materials procurement employee at COPA, whose duties include requisitioning material and labor for COPA's Drilling and Wells program.

8. Since approximately April 2019, FORREST advocated and received vendor approval through his chain-of-command for both DB Oilfield and Eco Edge to provide material

and labor to COPA. Once DB Oilfield was approved as a vendor, FORREST, in conjunction with BENEFIELD and AMANDA, conspired to submit false invoices and supporting documentation through Actian to COPA for material that did not exist, has never existed, and in most cases are impossible or impracticable to use in Alaska.

9. Likewise, once Eco Edge was approved as a vendor, FORREST, in conjunction with KEAYS and possibly AMANDA, conspired to submit false invoices and supporting documentation through Actian to COPA for material that did not exist, has never existed, and in most cases are impossible or impracticable to use in Alaska. Moreover, FORREST, KEAYS and possibly AMANDA conspired to submit false invoices through Actian to COPA for labor charges allegedly performed at various COPA locations across Alaska to include Alpine, 100% Pad, Kuparuk and the Alaska Railroad Yard in Fairbanks, Alaska. When in reality, Eco Edge did not do work at any of the locations.

10. The cumulative loss to COPA for monies paid via EFT to DB Oilfield and Eco Edge is $7,125,270. Of that amount, $4,148,000 was paid to DB Oilfield and $3,027,270 was paid to Eco Edge. Moreover, KEAYS is actively attempting to collect an additional $62,250 for labor and $98,430 for material. The labor was never performed, and the materials do not exist.

11. Based on a preliminary review of bank statements, it is suspected that approximately half of all the monies sent from COPA to Eco Edge is transferred to Spectrum Consulting Services, a company owned by FORREST and set up with the State of Alaska on April 5, 2019. Additionally, FORREST and AMANDA co-own another company with a similar name, Spectrum Consulting, which was also set up with the State of Alaska, but one day earlier on April 4, 2019.

DEC - 5 2019

7

12.     The 50 percent "kickback" to FORREST and AMANDA is likely for the benefit of KEAYS acquiring access as a vendor to COPA through FORREST. The bank statements also suggest that BENEFIELD has kicked back approximately 90 percent of all the monies COPA paid DB Oilfield. The money sent from DB Oilfield also went to Spectrum Consulting Services bank account.

13.     Through the summer of 2019, FORREST and AMANDA purchased 17 houses in Las Vegas, NV. The purchases were drawn on the Spectrum Consulting Services account, but the ownership of the houses were under Wright Capital Investments, LLC., a company set up in Nevada on July 21, 2019 by FORREST and AMANDA.

**PROBABLE CAUSE**

14.     KEAYS is the sole owner of Eco Edge.

15.     Eco Edge is a Limited Liability Company organized and domiciled in Anchorage, Alaska. Eco Edge was organized by KEAYS and Duane Keays on May 20, 2015. As of November 20, 2019, KEAYS was the sole owner of Eco Edge. Eco Edge's listed physical address is 2055 E. 79th St., Unit 106, Anchorage, AK 99507, which is a storage facility known as Garage Town USA.

16.     Eco Edge's North American Industry Classification System (NAICS) code from inception to the most recent filing with the State of Alaska Department of Commerce Community and Economic Development on November 8, 2018, was 238310 – Drywall and Insulation Contractors. The NAICS Code is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the American economy.

DEC – 5 2019

8

17.     On February 26, 2019, FORREST completed the new vendor set-up for Eco Edge. This formal process authorized Eco Edge to provide material and labor to COPA. FORREST described Eco Edge's value to COPA by stating Eco Edge could provide "Trial Rig Mats." FORREST justified Eco Edge as a vendor for COPA this way, "No other vendors have this type of mat. Eco Edge has the only provisional patent for this mat." This justification, as shown below, was documented within a new vendor setup form that was ultimately viewed and approved by FORREST's management:

**ConocoPhillips Alaska, Inc.**
**Internal Vendor Master Data Request Form**

**NEW VENDOR SET-UP APPROVAL**

For completion by the ConocoPhillips Alaska employee requesting vendor set-up

- Does the proposed spend meet Corporate OneCard guidelines? If so, an invoice should not be issued, and a new vendor master record is not needed
- Can the need be met with an existing supplier and/or contract? (Contact your local Supply Chain representative if uncertain.)
- If the need cannot be met with existing supplier, have proper approvals been obtained and are preferred payment methods and terms being utilized?
    o   Terms should not be less than N30 unless a contract is in place.
    o   The preferred payment is EFT or ACH, not wire transfers or checks.

| This Request Is For | ☑ Re-Occurring Purchases | ☐ One Time Purchase | |
|---|---|---|---|
| Date Required 2/26/19 | | Estimated Annual Spend 20,000 to 1,000,000 | |

| Vendor Name Eco Edge Armoring | |
|---|---|
| Subsidiary/Division of (if applicable) | |
| **Full Address** | Address  800 E. Dimond Blvd  Ste 193-464 |
| | City/Town Anchorage          State/Province AK  Country          Zip          99515 |

Name of Vendor Contact Nathan Keays

Brief Description of Goods/Services Supplied by Vendor Trial Rig Mats

Justification for Adding Vendor No other vendors have this type of mat. Eco Edge also has the only provisional patent for this mat.

| Approval Step | Name | Approved | Signature | Date |
|---|---|---|---|---|
| Step 1   - Requested By | Forrest Wright | N/A | N/A | |
| Step 1a - Supervisor Approval (Requestors Supervisor) | | ☐ Yes  ☐ No | DocuSigned by: *Chip Alvord* | 2/26/2019 |
| Step 2   - Scan & Email To | Sandy Kusano (ATO-1020A) Sandra.K.Kusano@conocophillips.com Sandy will print out form and take around to obtain signatures below | | | |
| Step 3   - Reviewed With (AK Supply Chain – Buyer, Proc. Coordinator, Contracts Spec.) | | ☐ Yes  ☐ No | DocuSigned by: *Denny Dobson* | 2/26/2019 |
| Step 4   HSE Approval Significant or High Risk ☐ Yes   ☐ No | | ☐ Yes  ☐ No | | |
| Step 5  Supply Chain Approval (Supply Chain Supervisor) | Kenton Steele | ☐ Yes  ☐ No | DocuSigned by: *Kenton Steele* | 2/26/2019 |

**PLEASE USE AUTO FILL FIELDS (Except Signature Section)**

Sandy Kusano will scan & email the completed approval request form back to the requestor.

(The requestor must include this form with the vendor request submitted to Jennifer Boyd for vendor processing)

*Requestor Information:*

| Date Completed:   2/26/2019 | Name: Forrest Wright | User ID: |
|---|---|---|

Notes:
Please create new vendor. YA 0103.

http://alaska.conocophillips.net/EN/Finance/Controllers/Pages/Forms.aspx                    Version1_111512

18.     On November 20, 2019, your affiant accessed the United States Patent and Trade Office's search function using the following two search terms: "Eco Edge Armoring" and "Trial Rig Mat." Both terms returned the following result, "No patents have matched your query."

19.     On February 26, 2019, Eco Edge's approval as a vendor was routed through three additional COPA employees.

20.     The same day, KEAYS submitted an EFT authorization agreement to COPA. KEAYS listed Alaska USA Federal Credit Union account ending in 7951 (hereinafter "AKUSA account ending in 7951") as the business checking account he wanted all COPA EFT's to be delivered into.

21.     The EFT authorization agreement was signed by KEAYS and listed KEAYS as the authorized name and owner of Eco Edge. KEAYS listed his e-mail address as: Nathan@ecoedgearmoring.com.

22.     On March 6, 2019, KEAYS provided COPA with a signed and dated Internal Revenue Service Form W-9.

23.     On March 5, 2019, KEAYS digitally signed a COPA Contract Strategy and Execution Approval document (hereinafter "the contract"). The contract was a single source contract worth up to $1 million over five years to provide "inspection of OCTG for the drilling group." FORREST was COPA's technical owner of the contract, and provided the following sole source justification for COPA to award the work to Eco Edge without having to request bids from other companies, "Eco Edge Armoring (EEA), has the experience to do the job. They specialize primarily in Project Management and inspections specifically casing & tubing. There are a limited number of suppliers in the area with the experience and capacity to perform the work…" This aforementioned justification is documented below:

10

| Contract Title: MOA Inspection Services | | Drilling Rig Contract: ☐ | Base Contract gCMS #: 222577 |
| --- | --- | --- | --- |
| Supplier Legal Entity Name: Echo Edge Armoring LLC | | | |
| Supplier SAP ID (if available): | | Subsmlt/Empetual Software Contract: ☐ | Amendment. |
| Business Originator: Chip Alvord | | | Amd #:Choose an item. |
| Technical Owner: Forrest Wright | | | gCMS# |
| Supply Chain Contract Professional: Denny Dobson | | | |
| Geographic Scope: Alaska Region | | | |

| **Contracting Activities:** | Award Criteria: |
| --- | --- |
| New Agreement: ☒ MSA ☐ MPA ☐ CCU&DLA (ePay/Auto PU) ☐ CCU ☐ Other | ☐ Competitive Bid/RFP |
| ☐ Significant Amendment/Changes (SC concurrence, Finance and Clause Owner or its delegate Approval are required) | |
| ☐ Non-significant Amendment/Changes to existing agreement | ☐ Single/Sole Source |
| ☐ Change to Scope   ☐ Term Extension | |
| ☐ Change to Compensation   ☐ ☒ Administrative (no approvals required) | ☐ Re-negotiation |
| ☐ Exercise Option to Extend Term | ☐ Approved Procurement Plan as Applicable (Attach Plan) |

| Wt % (input format: 0.50) | | Gross | | |
| --- | --- | --- | --- | --- |
| | | Aggregate Amendment Value $ (AAV) | Total Contract Value (GEV + AAV) | |
| 95.00% | Estimated Value $ | | | |
| Base Contract Value (GEV) | 1,000,000 | | 1,000,000 | |
| Amd #1 Current Amendment Value (CAV) | | 0 | 1,000,000 | |
| Amd #2 Current Amendment Value (CAV) | | 0 | 1,000,000 | |
| Amd #3 Current Amendment Value (CAV) | | 0 | 1,000,000 | |
| Amd #4 Current Amendment Value (CAV) | | 0 | 1,000,000 | |
| Cells highlighted in grey are for input | | Net | | |
| Base Contract Value (GEV) | 950,000 | | 950,000 | |
| Amd #1 Current Amendment Value (CAV) | | 0 | 950,000 | |
| Amd #2 Current Amendment Value (CAV) | | 0 | 950,000 | |
| Amd #3 Current Amendment Value (CAV) | | 0 | 950,000 | |
| Amd #4 Current Amendment Value (CAV) | | 0 | 950,000 | |

Global Strategy Sourcing Sub Category: GWO - Oilfield Labor - All
Compensation Type: Reimbursable
Prior Price Start Date: 03/05/2019   Price End Date: 03/05/2024
Pricing History:(Include previous pricing in terms of pricing per unit and if this purchase is a price increase, decrease or flat)
New Supplier no previous history.

**Background, Evaluation and Recommendation Highlights :**

Echo Edge Armoring will be providing inspection of OCTG for the drilling group.They are experienced and able to accommodate the drilling schedule especially during peak times.

**Single Source Justification**
Primary Reason/Explanation:

Eco Edge Armoring (EEA), has the experience to do the job.  They specialize primarily in Project Management and inspections specifically casing & tubing.  There are a limited number of suppliers in the area with the experience and capacity to perform the work.  Utilizing EEA will ensure adequate  and consistent coverage during peak cycles.

| Long Range Highlights (describe the supplier relation and strategy) | Contract Management Plan   Yes ☐  No ☒ |
| --- | --- |
| This contract is reimbursable, we only pay for work completed and can control the size of the scope at any time. While it's a 5 year commitment, we hold the scope level decisions, and can decrease at any time. | |

| Estimated Contract Value for Approval | | | Contract Term > 5 Years ☐ ( See Note 6 below) |
| --- | --- | --- | --- |
| | Gross $ | Net $ | Effective Start Date: 03/05/2019  Effective End Date: 03/05/2024 |
| Base Contract Value (GEV): | 1 MM | .95MM | Requested Expiration Date: |
| Aggregate Amendment Value(AAV): | | | Proposed Renewal Options: |
| Supply Chain Concurrence (Based on Gross Estimated Value) | | | Financial Approvals(Based on Net Estimated Value) |

24.     As referenced above, Eco Edge, since its inception has reported to the State of Alaska that it was a "Drywall and Insulation Contractor." Moreover, KEAYS's fulltime job is as an Anchorage Police Department K-9 Officer. Your affiant has found nothing to support FORREST's sole source justification that Eco Edge had the "experience," and that they "specialize in…casing and tubing."

25.     Moreover, KEAYS began viewing the contract through DocuSign at 1:29:28 PM on March 5, 2019. KEAYS signed the contract at 1:35:09 PM using IP Address: 12.17.191.99. This particular IP Address was held by Borealis Broadband, Inc., an Anchorage based Internet Service Provider. Records provided by Borealis Broadband, Inc., showed IP Address 12.17.191.99 was assigned to Kelly and NATHAN KEAYS. The service address was the **TARGET RESIDENCE.**

DEC - 5 2019

26.     On March 19, 2019, KEAYS registered an account with Actian. On November 14, 2019, your affiant interviewed Cindi Klose, Director of Treasury Services, ConocoPhillips Company. Klose described Actian as an e-invoicing solution that ConocoPhillips Company uses. Once an account is registered with Actian, vendors, including Eco Edge, log into the Actian tool to enter and submit their invoices. Upon submission through Actian, the invoice details are automatically populated in the ConocoPhillips Company's SAP system. Once all of the checks are completed in the SAP system, the invoice is paid via EFT to the vendor after approximately 30-days. The submission of invoices through the Actian tool necessarily requires vendors, and in this case Eco Edge, to access and utilize the Internet to wirelessly transmit information (invoices and supporting documentation) through Actian to ConocoPhillips Company. Using Actian and receiving an EFT was the only available manner in which COPA vendors could receive payment.

27. Actian is headquartered in Palo Alto, California.

28. On November 20, 2019, Klose provided your affiant with all of the Eco Edge Actian tool logins for the year 2019, using ID: NathanK208120. There was a total of 20 logins ranging from March 19, 2019 through November 8, 2019. 18 of the 20 logins came from the same IP Address: 12.17.191.99. Records from Borealis Broadband, Inc., confirmed this IP Address as being the continuous IP Address for NATHAN and Kelly KEAYS at the **TARGET RESIDENCE** from March 5, 2019 through November 15, 2019.

29. Through the course of the investigation, it was learned that FORREST conducted much of his fraudulent activity using his COPA e-mail address: Forrest.N.Wright@conocophillips.com. Many of FORREST's e-mails were provided to your affiant from Jeff Laughlin, COPA's security manager. Pursuant to COPA's computer warning banner visible by all COPA employees upon logging into their COPA assigned computer, FORREST's e-mails were the property of COPA, and thus were turned over to your affiant without FORREST's knowledge and with the consent of COPA.

*22-INCH CASING*

30. On April 12, 2019, FORREST, using his COPA e-mail sent a message to Shon Robinson, COPA's Manager, Drilling and Wells, in which FORREST told Robinson that 22-inch pipe was only manufactured in three (3) places in the world, all of which was outside North America. Luckily, Forrest found a vendor (Eco Edge) that just happened to have 11,000 feet of 22-inch Sumitomo pipe in Anchorage at $85.50 per foot (as opposed to $450 - $500 per foot the other foreign vendors charge). FORREST went on to tell Robinson that the pipe was stored at Unique Machine, Inc. (UMI) in Anchorage. The total price for 11,000 feet was $941,440.50.



31.     The total price for the 22-inch seamless pipe was just under $1 million.  This level
was important, because according to Linda Barnett, a COPA Financial Analyst, FORREST had
the authority to requisition and approve materials up to $1 million.  Anything above that amount
would require someone other than himself to approve the acquisition.

32.     Later during the afternoon of April 12, 2019, FORREST sent an e-mail to Pat
Hanley, owner of Cal IV Tubulars, in which he stated, "…I'm trying to get my hands on a pipe
tally (any) to show one of our new folks.  Do you have an old one I can use?  Any size, weight
etc works, just for learning." (sic)  The next day, Hanley sent FORREST an example of a pipe
tally on an Excel spreadsheet.

33.     Acquiring the pipe tally from Hanley was essential for FORREST and KEAYS to
later successfully submit the invoice and supporting documentation (the pipe tally) through
Actian to COPA for payment via EFT.  The pipe tally Hanley provided to FORREST was later
submitted, with few changes, to support an Eco Edge invoice, as further described below.

34.     On April 14, 2019, KEAYS sent the following e-mail to FORREST:

> Forrest, you mentioned the need for some 22" joints (retainer) for your ERD project (22",
> .750", API 5L GRX52, R3).  It may not be ideal because I don't have certs (you
> mentioned your team said they don't need them as its nots for well bore stability) I did
> come across some that are Japanese (Sumitomo) pipe that my supplier has a liquidation
> pricing, been sitting on it for over 5 years.  Would you be interested?  New I was being
> quoted anywhere from $500/ft to $600/ft.  As discussed, I can get this for you and offer it
> for 88.50/ft. FOB Anchorage.  I have access to 15,500ft.  Unlike the cribbing, if you don't
> need that much, I can get exactly what you need, just let me know (you don't have to tak
> it all).  Nathan Keays

35.     The above e-mail contained industry specific measurement terms.  Particularly,
the measurements of the pipe: 22", .750", API 5L GRX52, R3.  The most important information
was what KEAYS referred to was pipe that measured 22-inches in diameter, with ¾-inch

thickness. R3 was a reference to Range-3 piping. Range-3 meant the pipe was anywhere between 38-feet and 42-feet long.

36.     Shortly thereafter, FORREST responded to KEAYS with the following e-mail: "Thanks for reaching out Nathan this is a very attractive price. Is the pipe at UMI? If it's the same stuff I'm thinking of I'd like to swing by and look before moving forward. Can we arrange a time to meet there? Thanks again, Forrest"

37.     Your affiant knows that Unique Machines, Inc. (UMI), is a company located at 8875 King St., Anchorage, AK. UMI is a machine shop that performs unique jobs for companies operating in Alaska, such as slotted liners to provide sand control in oil industry applications and threading large piping (up to 20-inches in diameter.) UMI also has an approximate 16-acre storage yard on site.

38.     On April 15, 2019, FORREST sent an e-mail to Charles Chapman, a COPA contractor working for Swift Engineering. Chapman was COPA's North Slope Drilling and Wells Technical Planner. FORREST told Chapman to create a purchase request for 11,011 feet of 22-inch retainer joints for the Alpine warehouse/inventory. Your affiant knows that COPA maintains a warehouse containing material necessary for oil drilling operations on the North Slope. FORREST informed Chapman that the purchase request was for Eco Edge and that all of the 22-inch joints were located at UMI, and will be held there for the time being. Attached to the e-mail to Chapman were three e-mail quotes:

>     a.     The first e-mail contained the quote from KEAYS in which he quoted $88.50 per foot, as described above in paragraph 35.
>
>     b.     The second attached e-mail, dated April 14, 2019, purportedly contained a quote from Hanley from Cal IV Tubing in which Hanley wrote, "Forrest, I

15

can get you the 11,000 ft of 22" .750 API 5L GRX52 you need for your ERD project at a very attractive price. It's Sumitomo pipe and located here in Anchorage. I'll offer it at $225/ft. FOB Anchorage I'm sure you know but new its over $500/ft. This is never used and still in great shape, its been sitting for 5-6 yrs. Please let me know if you have any questions. Thanks, Pat Hanley." (sic).

   c. The third attached e-mail, also dated April 14, 2019, purportedly contained a quote from Michael Thomas, President and Chief Operating Officer of Tubular Solutions Alaska (TSA), in which Thomas wrote, "Forrest, I have access to 15,500ft of Sumitomo 22" casing. Shell ordered it years ago for the offshore project they were going to do. The casing is still in great shape and we can get it to you for a great price. I can sell it for $375/ft. You mentioned needing 11,000' so would be $4,125,000 FOB Anchorage. This seems like a lot but is far less than buying new. There are only three suppliers in the world that make this size seamless on top of the 1 year plus lead time. Thanks, Michael."

39.    On November 14, 2019, your affiant interviewed Hanley. Hanley reviewed the above e-mail described in paragraph 39(b). Hanley denied sending the e-mail to FORREST. Hanley hired Michael Wheeler, a System Engineer from Alaska Computer Support, LLC to scrub his server logs to verify Hanley's recollection that he did not send the e-mail. Wheeler's determination was as follows, "We were unable to locate a sent email from you pat@cal4pip.com to Forrest.N.Wright@conocophillips.com on the date of / with a date time stamp of Sunday, April 14, 2019 5:23pm in the server logs. Additional (sic) the email thread that

16

3:19-MJ-00587-MMS

was sent over did not contain host headers with your server address in the email path. Lastly we did notice that the forwarded email that supposedly came from you was missing your footer."

40.    On November 15, 2019, your affiant interviewed Thomas. Thomas reviewed the above e-mail described in paragraph 39(c). Thomas also denied sending the e-mail to FORREST. Thomas meticulously dissected the e-mail, pointing out several problems with it that indicated he was not the author. For example, the color of his signature line was blue, and that was not the correct color associated with a newly sent e-mail. Moreover, the e-mail referenced in paragraph 39(c) contained Thomas's reply signature, which was different than his original sent e-mails. Thomas said he has not changed this formula for at least the past three-years. Thomas said the spacing of the e-mail was off, and there was verbiage he would never use. For example, the suspect e-mail included the total price for the pipe. Thomas said TSA was a professional organization and he would never quote product in the body of an e-mail nor would put the total cost of piping in an e-mail. Every quote TSA provides was tracked and put on an official quotation letterhead. Finally, Thomas understood why FORREST would fabricate an e-mail from him. Thomas opined FORREST did it to show COPA that he had a secondary quote to back up a purchase by a shell company (Eco Edge) at a below market rate.

41.    Thomas elaborated beyond the falsified e-mail. Thomas said TSA was a wholly owned subsidiary of Sumitomo, and a sister company to UMI. Contrary to what was quoted by Eco Edge to COPA, Sumitomo does not have the ability to manufacture 22-inch seamless casing (pipe). Thomas said there were no facilities in Alaska, or even on the West Coast that had the capability to thread 22-inch casing. Thomas said 22-inch casing was useless in Alaska. Thomas had never seen 22-inch casing used in the oil industry in his whole life. Moreover, Thomas said $88.50 per foot, as quoted by Eco Edge, was "slightly above scrap" metal. Thomas did a

17

calculation in front of your affiant, and determined that if 22-inch seamless casing that was ¾-inch thick existed, the cost per foot would be between $255 - $300 per foot.

42.     On November 13, 2019, your affiant interviewed Chris Shumate, President of UMI. As referenced above, there were several instances where it was conveyed that the 22-inch casing was stored at UMI. Shumate advised that he has never had 22-inch casing at his storage yard. Storing 11,000 feet of 22-inch casing would be visible from space, as it would take up about six-acres of his 16-acre yard. Shumate provided your affiant with a tour of UMI. Your affiant did not see any 22-inch casing. The only pipe that was close to being that large in diameter was a couple truck loads of 20-inch casing. Shumate showed your affiant the factory portion of UMI. Shumate confirmed that the largest machine they had for threading pipe was itself 22-inches in diameter. This meant that the largest pipe that could be run through the machine was 20-inches in diameter.

43.     At approximately 2:04 PM on April 15, 2019, Sonya Culver, a COPA Purchasing Analyst, approved Purchase Order (No. 4521620697) in the amount of $974,473.50 for "JOINT,RETAINER,22"X.750",API 5L,GRX52,R3."

44.     Purchase Order (No. 4521620697) was for 11,011 linear feet of 22-inch piping, as referenced above, has never existed.

45.     The Purchase Order listed KEAYS as the salesperson, and instructions for KEAYS to submit any invoice via Actian (ePay) using the following internet domain name: http://vendors.conocophillips.com. It also referenced KEAYS's April 14, 2019 e-mail quote for pricing terms.

46.     At 8:43 PM on April 16, 2019, Kurt Kegler, a COPA contractor who worked for ASRC Energy, attached a goods receipt in COPA's SAP system. The goods receipt, if done

DEC - 5 2019

correctly, tells COPA that Kegler laid eyes on the material and verified it was on site. However, based on other schemes in which FORREST used his COPA e-mail to inform contractors that others have verified the existence of material, it is your affiant's belief that FORREST told Kegler that someone else had verified its existence, and Kegler entered the goods receipt without himself actually verifying the material existed. This belief is based on FORREST's pattern of behavior with respect to other schemes. Your affiant has yet to locate and view e-mails that specifically indicate FORREST told Kegler to submit the goods receipt, nor has your affiant interviewed Kegler due to the higher interest of keeping the investigation covert until after having served search warrants.

47.     At 4:43 PM on April 17, 2019, KEAYS or someone from inside the **TARGET RESIDENCE** accessed the internet, logged into the Actian tool using ID: NathanK208120 and submitted invoice #000057 in the amount of $974,473.50. Accompanying the invoice submission through Actian was a near carbon copy of the pipe tally that FORREST had acquired from Hanley on April 12, 2019, and more fully described above in paragraphs 33 and 34.

48.     Eco Edge and most vendors working for COPA are on a Net-30 payment schedule, meaning the vendor is paid approximately 30-days after the invoice is received and approved in COPA's system. On May 16, 2019, COPA sent an EFT in the amount of $974,473.50 to Eco Edge's AKUSA account ending in 7951. On May 19, 2019, this same amount, $974,473.50, posted to Eco Edge's AKUSA account ending in 7951.

*MONEY LAUNDERING*

49.     As discussed above in paragraph 49, KEAYS received $974,473.50 as an EFT from COPA on May 19, 2019 into his Eco Edge AKUSA account ending in 7951.

19

50. On May 24, 2019, KEAYS sent three (3) checks totaling $895,036.75 to FORREST and AMANDA's Spectrum Consulting Services (SCS) account ending in 0183. The individual check numbers were: 1104 in the amount of $160,000; 1105 in the amount of $487,236.75; and 1106 in the amount of $247,800.

51. On May 24, 2019, FORREST and AMANDA's SCS account ending in 0183 received the same amount, $895,036.75, that KEAYS sent spread out over three (3) different checks.

52. On May 24, 2019, $13,200 in cash was withdrawn from FORREST and AMANDA's SCS account ending in 0183. On June 5, 2019, another $1,000 in cash was withdrawn.

53. On June 5, 2019, Dorothy Sweet, the Senior Commercial Escrow Officer at Fidelity National Title Agency of Nevada, Inc., sent FORREST an e-mail containing wire instructions for "15 separate residential pro, Las Vegas NV."

54. On June 7, 2019, FORREST and AMANDA utilized their SCS AKUSA account ending in 0183 to wire $1,042,000. This wire was sent to Fidelity National Title Agency of Nevada, Inc., to begin the purchase of "15 separate residential properties," in Las Vegas, NV, as represented below an estimated settlement statement taken from FORREST's COPA e-mail:





# FIDELITY NATIONAL TITLE AGENCY OF NEVADA, INC.

2450 St. Rose Parkway, Suite 150, Henderson, NV 89074

Phone: (702) 932-3150    Fax: (702) 942-8114

**Buyers/Borrowers Settlement Statement**

**Estimated**

| Escrow No: 00091311 - 118 DS | Close Date: 08/14/2019 | Proration Date: 08/14/2019 | Disbursement Date: |
|---|---|---|---|

Buyer(s)/Borrower(s): Wright Capital Investments LLC, a Nevada limited liability company
1901 Colony Place
Anchorage, AK 99507

Property:    15 separate residential properties
Las Vegas, NV

Brief Legal:

| Description | Debit | Credit |
|---|---|---|
| **TOTAL CONSIDERATION:** | | |
| Total Consideration | 3,879,000.00 | |
| Earnest money deposit/commission | | 1,042,000.00 |
| **ADDITIONAL CHARGES:** | | |
| Property Taxes - 2, 3, 4th 1/4 to Clark County Treasurer | 9,244.71 | |
| Adjustments at close to Buyer | 1,500.00 | |
| Transfer to 91380 to Fidelity National Title | 1,100.00 | |
| Transfer to 91385 to Fidelity National Title | 2,110.00 | |
| **PRORATIONS AND ADJUSTMENTS:** | | |
| County Taxes from 8/14/2019 to 10/1/2019 based on the Quarterly amount of $3,367.70 | 1,768.69 | |
| Sewer CCWR, from 8/14/2019 to 10/1/2019 based on the Quarterly amount of $118.58 | 61.93 | |
| CLV e,f,i,m from 8/14/2019 to 11/1/2019 based on the Quarterly amount of $262.28 | 224.40 | |
| CLV b,h,k from 8/14/2019 to 9/1/2019 based on the Quarterly amount of $198.31 | 37.46 | |
| CLV c,d,j,l from 8/14/2019 to 10/1/2019 based on the Quarterly amount of $383.82 | 200.44 | |
| Trash Arrow from 8/14/2019 to 10/1/2019 based on the Quarterly amount of $44.76 | 23.37 | |
| Trash Bartlett from 7/1/2019 to 10/1/2019 based on the Quarterly amount of $45.87 | 45.87 | |
| Trash 13 ho from 8/14/2019 to 9/1/2019 based on the Quarterly amount of $612.02 | 115.60 | |
| **COMMISSIONS:** | | |
| Buyer paid commission to Sin City Realty LLC. | 38,790.00 | |
| **ESCROW CHARGES:** | | |
| Escrow Fee to Fidelity National Title Agency of Nevada, Inc. | 1,550.00 | |
| **TITLE CHARGES:** | | |
| Investor Rate escrow to Fidelity National Title Agency of Nevada, Inc. | (465.00) | |
| E Recording Fee to Simplifile | 4.50 | |
| **RECORDING FEES:** | | |
| Recording Fees to Fidelity National Title Agency of Nevada, Inc. | 40.00 | |
| Sub Totals | 3,935,341.97 | 1,042,000.00 |
| Balance Due From Buyer /Borrower | | 2,893,341.97 |
| Totals | 3,935,341.97 | 3,935,341.97 |

It is agreed by the undersigned that the foregoing statement may change if a change in the escrow closing occurs or if other unforeseen contingencies arise. In the event changes in the statement become necessary, you are nevertheless authorized to close this escrow. It is understood that we will receive a final statement of account if the above totals are changed.

DEC - 5 2019

3:19-MJ-00587-MMS

Case 3:19-mj-00587-MMS   Document 1-1   Filed 12/05/19   Page 21 of 29


55.     Prior to closing on the properties, but after the initial $1,042,000 down payment, FORREST and AMANDA set up a company in Nevada to act as the owner of the properties. That company, Wright Capital Investments, LLC, was organized by FORREST and AMANDA on July 21, 2019.

56.     KEAYS continued to send ill-gotten funds related to other fraudulent schemes from his Eco Edge AKUSA account ending in 7951 to FORREST and AMANDA's SCS AKUSA account ending in 0183.

57.     For example, on May 27, 2019, KEAYS received $98,430 as an EFT from COPA into his Eco Edge AKUSA account ending in 7951.

58.     On May 29, 2019, KEAYS issued a check (No. 1108) in the amount of $49,215.

59.     The same day, on May 29, 2019, a check in the same amount, $49,215, was deposited into FORREST and AMANDA's SCS AKUSA account ending in 0183.

60.     On June 2, 2019, KEAYS received three (3) EFT deposits from COPA into his Eco Edge AKUSA account ending in 7951.  The deposits were in the amounts of $37,050; $82,500; and $99,300, respectively, and totaled $218,850.

61.     On June 5, 2019, KEAYS sent four (4) checks totaling $130,875 to FORREST and AMANDA's Spectrum Consulting Services (SCS) account ending in 0183.   The individual check numbers were:  1109 in the amount of $49,650; 1110 in the amount of $41,250; 1111 in the amount of $18,525; and 1112 in the amount of $21,450.

62.     On June 5, 2019, FORREST and AMANDA's SCS account ending in 0183 received the same amount, $130,875, that KEAYS sent spread out over four (4) different checks.



DEC - 5 2019

63. On August 12, 2019, FORREST and AMANDA utilized their SCS AKUSA account ending in 0183 to wire $2,893,341.97. This wire was presumably sent to Fidelity National Title Agency of Nevada, Inc., to complete the purchase of the "15 separate residential properties," in Las Vegas, NV.

64. The origination of the funds in FORREST and AMDANDA's SCS AKUSA account ending in 0183 at the time the final wire was sent to complete the purchase of the houses in Las Vegas, NV, emanated from KEAYS's Eco Edge AKUSA account ending in 7951, as well as from DB Oilfield's AKUSA account ending in 5982.

65. On November 24, 2019 your affiant searched the Clark County Assessor's website by inputting "Wright Capital Investments, LLC" and learned that Wright Capital Investments, LLC owns the following properties:

    a. 6233 Espinosa Avenue, Las Vegas, NV

    b. 5908 W. Bartlett Avenue, Las Vegas, NV

    c. 1524 Saylor Way, Las Vegas, NV

    d. 1400 Saylor Way, Las Vegas, NV

    e. 5824 Iris Avenue, Las Vegas, NV

    f. 5821 Halifax Avenue, Las Vegas, NV

    g. 716 Vincent Way, Las Vegas, NV

    h. 609 Cline Street, Las Vegas, NV

    i. 501 Slayton Drive, Las Vegas, NV

    j. 4609 Sawyer Avenue, Las Vegas, NV

    k. 721 Fairway Drive, Las Vegas, NV

    l. 1826 Green Acres Avenue, Las Vegas, NV



m.  5201 Mountain View Drive, Las Vegas, NV

n.  3973 Arrowood Drive, Spring Valley, NV

<u>**COMPUTER-RELATED DEFINITIONS**</u>

66.     The following definitions apply to this Affidavit and Attachment B:

a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

c.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

24



DEC - 5 2019

d. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

e. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

f. "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g. A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications. For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services. See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.



h.    "Electronic Storage Device" includes, but is not limited to, external and internal hard drives, thumb drives, flash drives, SD cards, gaming devices with storage capability, storage discs (CDs and DVDs), cameras, cellular phones, smart phones and phones with photo-taking and/or internet access capabilities, and any "cloud" storage by any provider.

i.    "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet. FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

j.    "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

k.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

l.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m.    "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

26



DEC - 5 2019

n.     "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone. The term "computer," as defined in 18 U.S.C. § 1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

## SPECIFICS ON SEARCH AND SEIZURE OF COMPUTERS

67.     I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and information related to me by agents and others involved in the forensic examination of cell phones, I know that data can be stored on a variety of systems and storage devices. I also know that during the search of the premises it is not always possible to search cell phones for data for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched;

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may

27



contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted; and

c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

**LIMIT ON SCOPE OF SEARCH**

68.     I submit that if during the search, agents find evidence, fruits, and/or instrumentalities of crimes not set forth in this affidavit, another agent or I will seek a separate warrant.

**REQUEST FOR SEALING OF MATTER**

69.     I request that the Court order sealing this case until further order of the Court. The documents filed in the case discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

**CONCLUSION**

70.     As noted above, this affidavit is made in support of an application for a warrant to search **KEAYS's** residence located at **14391 Canyon Road, Anchorage, Alaska, 99516,** more particularly described in Attachment A, and to seize the items set forth in Attachment B.  As

28

detailed herein, I respectfully submit that there is probable cause to believe that **KEAYS**, a resident of **14391 Canyon Road, Anchorage, Alaska, 99516,** maintains evidence, fruits, and instrumentalities of 18 U.S.C. § 1343 – Wire Fraud, 18 U.S.C. § 1956 – Laundering of Monetary Instruments, 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, and 18 U.S.C. § 371 – Conspiracy to commit Wire Fraud and Money Laundering (*i.e.*, the **SUBJECT OFFENSES**), further detailed in Attachment B, in his residence located at **14391 Canyon Road, Anchorage, Alaska, 99516.**

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Signed: _____     Date: _12-5-19_
　　　　　Tyler Vose, Special Agent

Subscribed and sworn to before me this ⸏ day of December, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

29